# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF COLORADO

|  |  |
|---|---|
| In re:<br><br>American Eagle Energy Corporation<br>Tax ID / EIN: 20-0237026<br><br>AMZG, Inc.<br>Tax ID / EIN: 20-8642477<br><br>    Debtors.<br>_____<br><br>American Eagle Energy Corporation,<br><br>    Plaintiff,<br><br>vs.<br><br>Power Energy Partners LP; T&A Energy, Inc.; Power Crude Transport, Inc.; and William Jegen<br><br>    Defendants. | Chapter 11<br>Case No.  15-15073-HRT<br><br><br>Case No. 15-15074-HRT<br>(Jointly Administered)<br><br><br><br><br><br>DC No. 1:16-cv-00043-RM<br><br>Adversary Proc. No. 15-1444 HRT |

## SECOND AMENDED COMPLAINT

Plaintiff, American Eagle Energy Corporation, as debtor and debtor-in-possession ("**American Eagle**" or "**Debtor**" or "**Plaintiff**"), hereby files this Second Amended Complaint against defendants Power Energy Partners LP ("**Power**"), T&A Energy, Inc. ("**T&A**"), Power Crude Transport, Inc. ("**PCT**"), and William Jegen ("**Jegen**") (collectively, Power, T&A, PCT, and Jegen are hereinafter referred to as "**Defendants**"):

## PARTIES AND SERVICE

1.       Plaintiff may be served through its counsel, Jimmy D. Parrish, at Baker & Hostetler LLP, 200 South Orange Avenue, SunTrust Center, Suite 2300, Orlando, Florida 32801.

2.       Power is a Delaware limited partnership who may be served with process, pursuant to Bankruptcy Rule 7004, by serving it at its corporate headquarters, 1927 Lohmans Crossing, Suite 103, Lakeway, Texas 78734.

3.       T&A Energy, Inc. is an Illinois limited liability company who may be served with process pursuant to Bankruptcy Rule 7004, by serving it at its corporate headquarters, 1927 Lohmans Crossing, Suite 103, Lakeway, Texas 78734.

4.       PCT is an Illinois corporation who may be served with process pursuant to Bankruptcy Rule 7004, by serving it at its corporate headquarters, 1927 Lohmans Crossing, Suite 103, Lakeway, Texas 78734.

5.       William Jegen is an individual who may be served with process pursuant to Bankruptcy Rule 7004, by serving him at his residence, 207 Canyon Turn Trail, Lakeway, Texas 78734.

## JURISDICTION

6.       This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157(a) in that this action arises in and relates to the Debtor's bankruptcy case currently pending before this Court.

7.       This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) and (E).

8.       Venue is proper before this Court pursuant to 28 U.S.C. § 1409(a).

## BACKGROUND

9.      On July 1, 2013, in connection with the Debtor's exploration and production business, the Debtor entered into that certain Lease Crude Oil Purchase Agreement contract, Number AE-07013-0001, with Power ("**Agreement**").  The Agreement is attached hereto and incorporated herein as **Exhibit "A"**.

10.     The term of the Agreement is July 1, 2013 through December 31, 2015.

11.     The Agreement provided that American Eagle would sell all the oil it produced to Power.  Specifically, Section 5 of the Agreement provided:

> Net Payment is due without deduction, offset, or counterclaim for amounts owed by or to any third party (including without limitation, amounts owed by or to any affiliate of either Party) on or before the 20th day of the month following the delivery month via wire transfer of immediately available US Dollars.

12.     In conjunction with the Agreement, Power entered into various agreements with third parties whereby it would immediately sell the oil it collected from American Eagle at a profit ("**Subsequent Sale Agreements**").  Through the Subsequent Sale Agreements, Power was obligated to deliver fixed quantities of oil to third parties for fixed periods into the future.  Failure to deliver the specified quantities of oil would cause Power to default under the Subsequent Sale Agreements.

13.     From July 2013 through October 2015, under the Agreement, Power collected all of American Eagle's oil at American Eagle's various wells.

14.     From July 2013 through October 2015, under the Agreement, Power was obligated to pay American Eagle for all of American Eagle's oil that Power collected.

15.     Under the Agreement, Power was obligated to pay American Eagle for all of the oil that Power collected at a price fixed under the Agreement.

16.    From July 2013 through February 2015, Power paid all amounts owed to American Eagle under the Agreement.

17.    For all of American Eagle's oil that Power collected from July 2013 through February 2015, Power paid all amounts due American Eagle for a particular month's oil collection by the twentieth day of the following month.

18.    Beginning in April 2015, and continuing through October 2015, Power, at the direction of Jegen, failed to deliver all amounts due American Eagle for the prior month's oil collection.

19.    For the oil Power collected from March 2015 through October 2015, Power, at the direction of Jegen, sold the oil to Global Companies LLC, and upon information and belief, received payments in amounts greater than the amounts Power owed to American Eagle for such oil.

20.    For oil collected from March 2015 through October 2015, Jegen directed Power to withhold amounts owed American Eagle (**"Amounts Owed"**), alleging the Amounts Owed were being withheld (a) to pay third party vendors asserting claims against American Eagle (**"Vendors"**); (b) to pay charges for alleged excessive hydrogen sulfide (**"H2S"**); or (c) to pay other charges assessed by Power.  Power did not transfer the Amounts Owed to pay either the Vendors, or H2S related expenses.  Instead, at the direction of Jegen, Power utilized the Amounts Owed to pay Power expenses, or otherwise to transfer and dissipate the Amounts Owed to insiders or Power Affiliates, including Jegen.

21.    On May 8, 2015 (**"Petition Date"**), American Eagle along with its affiliate AMZG, Inc., filed voluntary petitions for relief under chapter 11 of Title 11 of the United States

Code ("**Bankruptcy Code**"). Prior to the Petition Date, Debtor supplied Power with oil in accordance with the Agreement.

22.     In connection with oil provided after the Petition Date, Power retained approximately **$2,784,880.27** in the Debtor's funds for September 2015 production ("**September Production Funds**") and retained approximately **$2,497,653.55** in the Debtor's funds for October 2015 production ("**October Production Funds**").

23.     Together, the September Production Funds and the October Production Funds constitute property of the Debtor's bankruptcy estate ("**Production Funds**").

24.     American Eagle contacted Power and requested that the Production Funds be immediately turned over to American Eagle pursuant to 11 U.S.C. § 542(a).

25.     Power refused to turnover the **$5,282,533.82** in Production Funds to the Debtor.

26.     Power does not dispute that it collected the oil from American Eagle for the September Production and the October Production, or that it sold to third parties the oil it collected.

27.     Power has wrongfully withheld **$1,039,954.21** from payments to the Debtor for fees related to alleged excessive H2S content in oil collected by Power ("**Unauthorized H2S Holdbacks**").

28.     Power has wrongfully withheld **$112,735.20** from payments to the Debtor for alleged pre-petition water hauling charges Power alleges American Eagle owed to PCT ("**Unauthorized Pre-petition Holdbacks**").

29.     Since the Petition Date, Power has wrongfully withheld **$177,101.02** from payments to the Debtor for duplicate water hauling charges previously paid to PCT by the Debtor ("**Unauthorized Duplicate Holdbacks**").

30.     Since the Petition Date, Power has wrongfully withheld **$80,255.11** from payments to the Debtor for improper legal and accounting fees ("**Unauthorized Professional Fee Holdbacks**").

31.     Debtor has notified Power that it is in breach of the Agreement as a result of its failure to turnover the Production Funds and for wrongfully withholding the Unauthorized H2S Holdbacks, the Unauthorized Pre-petition Holdbacks, the Unauthorized Duplicate Holdbacks, the Unauthorized Professional Fee Holdbacks totaling **$1,410,045.54** (collectively, the "**Unauthorized Holdbacks**").

32.     Despite receiving payments in September 2015 in excess of $700,000 from Power for obligations allegedly owed by American Eagle, PCT continues to assert that it holds a secured mechanic's lien claim in the amount of $820,485.54 against American Eagle ("PCT Claim").  PCT has not provided substantiation for the amount, or basis of its PCT Claim.

33.     Power, T&A, PCT, and Jegen are all affiliated with one another.  Jegen, either individually or through other entities, is a controlling principal, manager, officer, director, shareholder, or partner of Power, T&A, and PCT.

34.     Jegen, as organizer, promoter, or investment advisor, obtained capital from investors in approximately eighteen entities that he designated as "Power Energy Partners and Affiliates" (the "**Power Affiliates**").  T&A and its affiliate, T&A Capital LLC hold equity in sixteen affiliates, with the Power Affliates having interests in energy, hospitality, real estate, and financial services assets.  Jegen, as organizer, promoter, or investment advisor, either directly or indirectly, controls the Power Affiliates.  With George Archos, and Robert Trusz filling management roles, Jegen bills himself as the "President and CEO" of the Power Affiliates, controlling the affiliated entities.  Jegen received salary, wages, commissions, fees,

6

reimbursements for personal expenses, and/or other benefits from the Power Affliates. Jegen's performance as an investment advisor, and his ability to solicit and obtain future investments from investors, is dependent on the financial success of the Power Affiliates.

35.     Utilizing the Power Affiliates, Jegen constructed and orchestrated an enterprise dependent on one another for cash flow, through which he personally benefitted by obtaining salaries, wages, fees, commissions, expense reimbursements, and entity-owned but personally utilized assets.

36.     In addition to the Agreement, in August 2013, Power Energy Holdings LLC, one of the Power Affiliates, and an entity controlled, managed, or directed by Jegen, acquired 12.9 percent of American Eagle's stock (the "**Stock**") for approximately $14 million. Through the Agreement, the Stock, and PCT's revenue for services related to the Agreement, Jegen and the Power Affliates were significantly invested in American Eagle, and dependent on American Eagle's financial success for Jegen's and the Power Affliates' economic prosperity.

37.     From August 2013 onward, Jegen communicated frequently with American Eagle regarding the Stock, American Eagle's operations, and strategic issues, providing recommendations for actions by American Eagle, raising concerns about American Eagle's value, and requesting inside financial information not disseminated to the public. At various times prior to October 2014, Jegen communicated with American Eagle management about his concerns over American Eagle's stock price.

38.     Commencing in approximately October 2014, aggressive production and intentionally reduced prices by Saudi Arabian oil sellers caused the price per barrel of oil in the United States to begin to drop precipitously, greatly reducing revenues from the sale of oil and gas. The drop in revenue caused significant distress to American oil and gas companies,

including American Eagle, whose operational expense and debt service obligations depended on a healthy value for the sale of their oil.

39.    American Eagle's financial distress concerned Jegen, who was worried that American Eagle's inability to produce oil, or sale of its assets, would severely reduce the value of the Stock held by Power Energy Holdings, LLC, jeopardize Power's obligations under the Subsequent Sale Agreements, and severely reduce Power's revenues and cash flow, from which Jegen personally, and the Power Affiliates, benefitted.  Additionally, Jegen was significantly concerned that he had promoted the investment value of American Eagle Stock to investors, and his professional performance and reputation as an investment advisor was imperiled by American Eagle's financial distress.

40.    Through late 2014 and early 2015, Jegen contacted American Eagle frequently, inquiring about American Eagle's negotiations with its creditors, the status of its operations, and requesting financial data and reports.  By early 2015, Jegen was aware that American Eagle would likely default on its debt financing obligations, and that the senior secured lender was threatening foreclosure of its security interests in American Eagle.  At the same time, Jegen was aware that the $14 million equity investment by Power Energy Holdings LLC was significantly imperiled, and would be unrecoverable in the event of a foreclosure, asset sale, or bankruptcy of American Eagle.

41.    Commencing April 2015, Jegen directed Power to withhold certain amounts from payments from Power to American Eagle.  Jegen directed Power to withhold the amounts to attempt to offset Power's and Power Energy Holdings LLC's potential losses in the event of a foreclosure, asset sale, or potential bankruptcy by American Eagle.

42.     While commencing his strategy to reduce potential losses by Power and other Power Affiliates, Jegen misrepresented to American Eagle that he was its ally in defending against its financial distress, and with its negotiations with its senior secured creditor.  Beginning in early 2015, Jegen indicated to American Eagle that he was attempting to put together a potential "white knight" funding source ("**Potential Financing**") to help American Eagle through its financial distress.  During this period, Jegen solicited extensive assistance from American Eagle in obtaining financial information and developing valuation and acquisition strategy.  Relying on Power's historic relationship with American Eagle, including frequent communications and an established confidential relationship, Jegen implied that he would assist American Eagle in avoiding foreclosure by its senior secured creditor, through an asset purchase he was orchestrating.  Through these communications, Jegen obtained frequent access to confidential financial data, and was able to constantly monitor American Eagle's financial state.

43.     Jegen misrepresented his intention to assist American Eagle with the Potential Financing.  Instead, Jegen utilized his unique access to American Eagle management and financial data to obtain continued access to American Eagle oil, withholding amounts owed to American Eagle, and while planning to sell American Eagle's oil to PEP's third party purchaser without paying American Eagle for it.

44.     Upon American Eagle's bankruptcy filing in May 2015, Jegen continued to communicate frequently with American Eagle management about his desire to acquire American Eagle's assets.  As the bankruptcy proceeded, however, Jegen failed to organize a competitive bid for American Eagle's assets.  As American Eagle's investment banker organized and facilitated an asset sale transaction under 11 U.S.C. § 363, Jegen actively monitored the developments and the role that Power might play with a potential purchaser of American Eagle's

oil.  At, or shortly after an auction held on October 21, 2015, the asset purchaser advised Jegen and Power that it would not assume the Agreement, or otherwise negotiate a deal with Power for the sale of the future production of oil from the assets it was purchasing from American Eagle.

45.     On or about October 21, 2015, Jegen and Power were aware that American Eagle would reject the Agreement, and Power would not receive any further oil from American Eagle, or the asset purchaser, after the closing of the asset sale.  Jegen was aware that Power would be unable to fulfill its future obligations to Power's third party oil purchaser, Global Companies, LLC.  Jegen was aware that Power Energy Holdings, LLC would not receive any recover for its $14 million equity investment in American Eagle.  Jegen directed Power to withhold all of the amounts that Power owed American Eagle for American Eagle's September 2015 and October 2015 oil production.  On or about October 22, 2015, Jegen directed Power to pay as many expenses as possible, or to otherwise dissipate all amounts that Power had in its possession that it had received from selling American Eagle's September 2015 and October 2015 production.  By November 5, 2015, Power, under Jegen's direction, had transferred and dissipated all of the funds it had received from the sale of American Eagle's September 2015 and October 2015 production.

## COUNT I (Against Power Energy Partners, LP) ACCOUNTING

46.     The Debtor realleges and incorporates by reference herein the preceding paragraphs as if fully set forth herein.

47.     Power has an obligation under the Agreement to pay the Debtor without offset, deduction, or counterclaim for amounts owed by or to any third party (including without limitation, amounts owed by or to any affiliate of either party) on or before the 20th day of the month following the delivery month via wire transfer of immediately available US Dollars.

48.     Power has failed to comply with the Agreement in that it has failed to turnover the Production Funds and it has wrongfully withheld the Unauthorized Holdbacks.

49.     Power has received, and failed to turnover to the Debtor approximately **$6,677,398.00** in funds belonging to the Debtor, and has failed to account to the Debtor for such funds.

50.     Power has indicated that it is no longer in possession of the majority of, if not all of, the **$6,677,398.00** owed to the Debtor and that it is currently "bankrupt."

51.     The Debtor is entitled to an accounting of the approximately **$6,677,398.00** of the Debtor's funds it has received, withheld, continues to hold, or has transferred.

**WHEREFORE**, American Eagle Energy Corporation respectfully requests the Court enter a judgment ordering Power Energy Partners LP to immediately provide an accounting of all amounts owed to the Debtor, and granting such other and further relief that the Court deems appropriate.

## COUNT II (Against Power Energy Partners, LP)
## BREACH OF CONTRACT

52.     The Debtor realleges and incorporates by reference herein the preceding paragraphs as if fully set forth herein.

53.     Power and Debtor entered into the Agreement whereby Debtor is required to sell its oil to Power monthly and Power is required to remit payment on the 20th day of every month to Debtor.

54.     The Agreement is binding and enforceable.

55.     Power does not dispute that the Debtor has performed its obligations under the Agreement.

56.     Power has failed to turnover the Production Funds earned by the Debtor in exchange for the oil that Power received as required under Section 5 of the Agreement.

57.     Power has also wrongfully withheld the Unauthorized Holdbacks from amounts rightfully owed to the Debtor.

58.     Consequently, Power is currently in breach of the Agreement.

59.     Debtor has notified Power that it is in breach of the Agreement as a result of its failure to remit the various payments to the Debtor.

**WHEREFORE**, American Eagle Energy Corporation respectfully requests the Court enter a judgment: (i) finding that Power Energy Partners LP has breached the Agreement; (ii) against Power Energy Partners LP in favor of American Eagle Energy Corporation in the amount of **$6,677,398.00**, plus interest and costs; and (iii) granting such other and further relief that the Court deems appropriate.

### COUNT III (Against T&A Energy, Inc.)
### FRAUDULENT TRANSFER (Fraud as to Present or Future Creditors)

60.     The Debtor realleges and incorporates by reference herein the preceding paragraphs as if fully set forth herein.

61.     Since prior to the Petition Date, Power has owed funds to the Debtor, including amounts for improper set-off claims and amounts owed and unpaid.

62.     Power with the actual intent to hinder, delay, or defraud creditors, transferred more than **$1,650,000.00** to T&A.

63.     Power did not receive reasonably equivalent value in return for the transfers and/or obligations incurred to T&A.

64.     At the time of the transfers to T&A, Power was engaged or was about to engage in a business or a transaction for which the remaining assets of Power were unreasonably small in relation to the business or transaction.

65.     At the time of the transfers to T&A, Power intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

66.     T&A is an "insider" of Power as that term is defined under C.R.S. § 38-8-102.

**WHEREFORE**, American Eagle Energy Corporation respectfully requests the Court enter a judgment: (i) avoiding the actual fraudulent transfers made to T&A in violation of C.R.S. §38-8-105; (ii) entering a money judgment against T&A for the lesser of one and one one-half of the value of the assets transferred or one and one half of the amount necessary to satisfy the Debtor's claim, together with the Debtor's actual costs, including reasonable attorneys' fees; and (iii) granting such other and further relief that the Court deems appropriate.

### COUNT IV (Against Power Crude Transport, Inc.)
### FRAUDULENT TRANSFER (Fraud as to Present or Future Creditors)

67.     The Debtor realleges and incorporates by reference herein the preceding paragraphs as if fully set forth herein.

68.     Since prior to the Petition Date, Power has owed funds to the Debtor, including amounts related to the Unauthorized Holdbacks.  Such amounts remain owed and unpaid.

69.     Power with the actual intent to hinder, delay, or defraud creditors, transferred more than **$702,826.78** to PCT.

70.     Power did not receive reasonably equivalent value in return for the transfers and/or obligations incurred to PCT.

71.     At the time of the transfers to PCT, Power was engaged or was about to engage in a business or a transaction for which the remaining assets of Power were unreasonably small in relation to the business or transaction.

72.     At the time of the transfers to PCT, Power intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

73.     PCT is an "insider" of Power as that term is defined under C.R.S. §38-8-102.

**WHEREFORE**, American Eagle Energy Corporation respectfully requests the Court enter a judgment: (i) avoiding the actual fraudulent transfers made to PCT in violation of C.R.S. §38-8-105; (ii) entering a money judgment against PCT for the lesser of one and one one-half of the value of the assets transferred or one and one half of the amount necessary to satisfy the Debtor's claim, together with the Debtor's actual costs, including reasonable attorneys' fees; and (iii) granting such other and further relief that the Court deems appropriate.

## COUNT V (Against William Jegen)
## FRAUDULENT TRANSFER (Fraud as to Present or Future Creditors)

74.     The Debtor realleges and incorporates by reference herein the preceding paragraphs as if fully set forth herein.

75.     Since prior to the Petition Date, Power has owed funds to the Debtor, including amounts related to the Unauthorized Holdbacks.  Such amounts remain owed and unpaid.

76.     Power with the actual intent to hinder, delay, or defraud creditors, transferred more than **$71,200.17** to Jegen.

77.     Power did not receive reasonably equivalent value in return for the transfers and/or obligations incurred to Jegen.

78.     At the time of the transfers to Jegen, Power was engaged or was about to engage in a business or a transaction for which the remaining assets of Power were unreasonably small in relation to the business or transaction.

79.     At the time of the transfers to Jegen, Power intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

80.     Jegen is an "insider" of Power as that term is defined under C.R.S. §38-8-102.

**WHEREFORE**, American Eagle Energy Corporation respectfully requests the Court enter a judgment: (i) avoiding the actual fraudulent transfers made to Jegen in violation of C.R.S. §38-8-105; (ii) entering a money judgment against Jegen for the lesser of one and one one-half of the value of the assets transferred or one and one half of the amount necessary to satisfy the Debtor's claim, together with the Debtor's actual costs, including reasonable attorneys' fees; and (iii) granting such other and further relief that the Court deems appropriate.

### COUNT VI (Against T&A Energy, Inc.)
### FRAUDULENT TRANSFER (Fraud as to Present Creditors)

81.     The Debtor realleges and incorporates by reference herein the preceding paragraphs as if fully set forth herein.

82.     Since prior to the Petition Date, Power has owed funds to the Debtor, including amounts related to the Unauthorized Holdbacks.  Such amounts remain owed and unpaid.

83.     After the Debtor's claims against Power arose, Power transferred funds to T&A on account of an antecedent debt at a time when Power was insolvent.

84.     At the time the improper transfer was made by Power to T&A, T&A had reasonable cause to believe that Power was insolvent.

85.     Power did not receive reasonably equivalent value in return for the transfers and/or obligations incurred to T&A.

86.     T&A is an "insider" of Power as that term is defined under C.R.S. §38-8-102.

**WHEREFORE**, American Eagle Energy Corporation respectfully requests the Court enter a judgment: (i) avoiding the fraudulent transfers made to T&A in violation of C.R.S. §38-8-106; (ii) entering a money judgment against T&A for the lesser of the value of the assets transferred or the amount necessary to satisfy the Debtor's claim, together with the Debtor's actual costs, including reasonable attorneys' fees; and (iii) granting such other and further relief that the Court deems appropriate.

## COUNT VII (Against Power Crude Transport, Inc.)
## FRAUDULENT TRANSFER (Fraud as to Present Creditors)

87.     The Debtor realleges and incorporates by reference herein the preceding paragraphs as if fully set forth herein.

88.     Since prior to the Petition Date, Power has owed funds to the Debtor, including amounts related to the Unauthorized Holdbacks.  Such amounts remain owed and unpaid.

89.     After the Debtor's claims against Power arose, Power transferred funds to PCT on account of an antecedent debt at a time when Power was insolvent.

90.     At the time the improper transfer was made by Power to PCT, PCT had reasonable cause to believe that Power was insolvent.

91.     Power did not receive reasonably equivalent value in return for the transfers and/or obligations incurred to PCT.

92.     PCT is an "insider" of Power as that term is defined under C.R.S. §38-8-102.

**WHEREFORE**, American Eagle Energy Corporation respectfully requests the Court enter a judgment: (i) avoiding the fraudulent transfers made to PCT in violation of C.R.S. §38-8-106; (ii) entering a money judgment against PCT for the lesser of the value of the assets transferred or the amount necessary to satisfy the Debtor's claim, together with the Debtor's actual costs, including reasonable attorneys' fees; and (iii) granting such other and further relief that the Court deems appropriate.

### COUNT VIII (Against William Jegen)
### FRAUDULENT TRANSFER (Fraud as to Present Creditors)

93.     The Debtor realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

94.     Since prior to the Petition Date, Power has owed funds to the Debtor, including amounts related to the Unauthorized Holdbacks.  Such amounts remain owed and unpaid.

95.     After the Debtor's claims against Power arose, Power transferred funds to Jegen on account of an antecedent debt at a time when Power was insolvent.

96.     At the time the improper transfer was made by Power to Jegen, Jegen had reasonable cause to believe that Power was insolvent.

97.     Power did not receive reasonably equivalent value in return for the transfers and/or obligations incurred to Jegen.

98.     Jegen is an "insider" of Power as that term is defined under C.R.S. §38-8-102.

**WHEREFORE**, American Eagle Energy Corporation respectfully requests the Court enter a judgment: (i) avoiding the fraudulent transfers made to Jegen in violation of C.R.S. §38-8-106; (ii) entering a money judgment against Jegen for the lesser of the value of the assets transferred or the amount necessary to satisfy the Debtor's claim, together with the Debtor's

actual costs, including reasonable attorneys' fees; and (iii) granting such other and further relief that the Court deems appropriate.

**COUNT IX**
**(Against T&A Energy, Inc.; Power Crude Transport, Inc.; and William Jegen)**
**TORTIOUS INTERFERENCE WITH CONTRACT**

99.     The Debtor realleges and incorporates by reference herein the preceding paragraphs as if fully set forth herein.

100.     Defendants T&A, PCT, and Jegen were each aware of the existence of the Agreement.

101.     Defendants T&A, PCT, and Jegen were each aware of Power's obligations under the Agreement to preserve and not transfer the September Production Funds and the October Production Funds to parties other than the Debtor and the bankruptcy estate.

102.     Defendants T&A, PCT, and Jegen each intended to induce Power to breach its obligations under the Agreement.

103.     Defendants T&A, PCT, and Jegen each intended to induce Power to transfer some or all of the September Production Funds and the October Production Funds to parties other than the Debtor and the bankruptcy estate.

104.     Defendants T&A, PCT, and Jegen each intended to induce Power to transfer some or all of the September Production Funds and the October Production Funds to parties other than the Debtor and the bankruptcy estate in knowing and intentional violation of Power's obligations under the Agreement.

105.     Defendants T&A, PCT, and Jegen each took action to induce Power to breach its obligations under the Agreement by demanding or directing Power to transfer some or all of the September Production Funds and the October Production Funds to parties other than the Debtor or the bankruptcy estate.

18

106.     Defendants T&A, PCT, and Jegen each took action to induce Power to breach its obligations under the Agreement by accepting some or all of the September Production Funds and the October Production Funds from Power.

107.     Defendants T&A, PCT, and Jegen tortiously interfered with the Agreement.

108.     Defendants T&A, PCT, and Jegen's tortious interference with the Agreement proximately caused damages to the Debtor and the bankruptcy estate by rendering Power unable to meet its obligations to the Debtor and the bankruptcy estate under the Agreement.

**WHEREFORE**, American Eagle Energy Corporation respectfully requests the Court enter judgment against T&A, PCT, and Jegen for tortious interference with the Agreement and entering a money judgment against T&A, PCT, and Jegen, severally, for damages in an amount to be proven at trial, together with the Debtor's actual costs, including reasonable attorneys' fees, and granting such other and further relief that the Court deems appropriate.

<u>**COUNT X (Against William Jegen)**</u>
<u>**FRAUDULENT TRANSFER (Fraud as to Present Creditors)**</u>

109.     The Debtor realleges and incorporates by reference herein the preceding paragraphs as if fully set forth herein.

110.     Since prior to the Petition Date, Power has owed funds to the Debtor, including amounts related to the Unauthorized Holdbacks.  Such amounts remain owed and unpaid.

111.     After the Debtor's claims against Power arose, Power transferred funds to Jegen on account of an antecedent debt at a time when Power was insolvent.

112.     At the time the improper transfer was made by Power to Jegen, Jegen had reasonable cause to believe that Power was insolvent.

113.     Power did not receive reasonably equivalent value in return for the transfers and/or obligations incurred to Jegen.

114.     Jegen is an "insider" of Power as that term is defined under C.R.S. §38-8-102.

**WHEREFORE**, American Eagle Energy Corporation respectfully requests the Court enter a judgment: (i) avoiding the fraudulent transfers made to Jegen in violation of C.R.S. §38-8-106; (ii) entering a money judgment against Jegen for the lesser of the value of the assets transferred or the amount necessary to satisfy the Debtor's claim, together with the Debtor's actual costs, including reasonable attorneys' fees; and (iii) granting such other and further relief that the Court deems appropriate.

<u>**COUNT XI (Against William Jegen)**</u>
<u>**FALSE PRETENSES, FALSE REPRESENTATION,**</u>
<u>**OR ACTUAL FRAUD (Fraud as to Present Creditors)**</u>

115.     The Debtor realleges and incorporates by reference herein the preceding paragraphs as if fully set forth herein.

116.     Power transferred the Unauthorized Holdbacks ("**Holdback Transfers**") to various third parties, including T&A, PCT, Jegen, and other third parties ("**Third Parties**").

117.     After receiving the Production Funds, Power transferred the Production Funds ("**Production Transfers**") to Third Parties, T&A, PCT, and Jegen.

118.     Between September 29, 2015 and November 5, 2015, Power transferred $6,311,742.25 to Third Parties, T&A, PCT, and Jegen.

119.     Between September 29, 2015 and November 5, 2015, Power transferred $1,655,000.00 to T&A.

120.     Between September 29, 2015 and November 5, 2015, Power transferred $702,826.78 to PCT.

121.     Between September 29, 2015 and November 5, 2015, Power transferred $49,200.00 to Jegen.

122.    Between September 29, 2015 and November 5, 2015, Power transferred $3,904,715.47 to Third Parties.

123.    Jegen is a controlling officer, director, manager, or principal of Power.

124.    Jegen is a controlling officer, director, manager, or principal of T&A.

125.    Jegen is a controlling officer, director, manager, or principal of PCT.

126.    Jegen holds equity in Power, either directly or through third parties, holds a financial interest in Power, or has received transfers from Power.

127.    Jegen holds equity in T&A, either directly or through third parties, holds a financial interest in T&A, or has received transfers from T&A.

128.    Jegen holds equity in PCT, either directly or through third parties, holds a financial interest in PCT, or has received transfers from PCT.

129.    Jegen personally benefitted, including financially, from the Production Transfers and Holdback Transfers to T&A.

130.    Jegen personally benefitted, including financially, from the Production Transfers and Holdback Transfers to PCT.

131.    Jegen personally benefitted, including financially, from the Production Transfers and Holdback Transfers to Third Parties.

132.    Jegen directed Power to not transfer the Production Funds and Unauthorized Holdbacks to American Eagle.

133.    Jegen directed Power to transfer, or caused to be transferred, the Production Transfers and Holdback Transfers to T&A.

134.    Jegen directed Power to transfer, or caused to be transferred, the Production Transfers and Holdback Transfers to PCT.

135.    Jegen directed Power to transfer, or caused to be transferred, the Production Transfers and Holdback Transfers to Third Parties.

136.    But for the Production Transfers and the Holdback Transfers, Power could have paid the Production Funds and the Unauthorized Holdbacks to American Eagle.

137.    For his own benefit, Jegen directed Power to transfer, or caused to be transferred, the Production Transfers and Holdback Transfers.

138.    For his own benefit, Jegen directed Power, or caused Power, to perpetrate a fraud on American Eagle, creating the impression that American Eagle would be paid the Production Funds and the Unauthorized Holdbacks, while instead dissipating and transferring the money that could have paid American Eagle.

139.    Jegen directed or caused Power to transfer the Production Transfers and Holdback Transfers to T&A, PCT, and Third Parties for his own benefit.

140.    Jegen did not intend for Power to transfer the Unauthorized Holdbacks or Production Funds to American Eagle when he directed, or caused Power to collect American Eagle's oil between March 2015 and October 2015 ("**Mar-Oct Production**").

141.    Through past performance and the development of a highly communicative, trusting, and mutually dependent relationship, enhanced by the Stock and the Potential Financing, Jegen utilized false pretenses, false representations, and actual fraud to deceive and defraud American Eagle into allowing Power to continue to collect the Mar-Oct Production from American Eagle without paying American Eagle for such oil in full.

142.    Jegen intended to deceive and defraud American Eagle by directing or causing Power to collect the Mar-Oct Production, and directing or causing Power to not pay American Eagle the Production Funds or Unauthorized Holdbacks.

22

143.    Jegen intended to deceive and defraud American Eagle by directing or causing Power to transfer the Holdback Transfers and Production Transfers to T&A, PCT, Jegen, and Third Parties.

144.    Jegen intended that American Eagle would rely on Power's prior performance, and its highly communicative, trusting, and mutually dependent relationship with Power, enhanced by the Stock and the Potential Financing, and Jegen's assurances of future performance, in allowing Power to continue to collect American Eagle's Mar-Oct Production.

145.    American Eagle reasonably and justifiably relied on Power's past performance and its highly communicative, trusting, and mutually dependent relationship with Power, enhanced by the Stock and the Potential Financing, and Jegen's assurances of future performance in allowing Power to continue to collect the Mar-Oct Production.

146.    Jegen intended to utilize the Unauthorized Holdbacks and Production Funds for his personal benefit, and for the benefit of Power, T&A, PCT, and Third Parties, at the expense of American Eagle, the bankruptcy estate, and American Eagle's creditors.

147.    American Eagle, the bankruptcy estate, and third parties were actually damaged by Jegen's false pretenses, false representation, or actual fraud.

**WHEREFORE**, American Eagle Energy Corporation respectfully requests the Court enter a judgment: (i) against Jegen for false pretenses, false representation, or actual fraud against American Eagle; (ii) entering a money judgment against Jegen for the damages caused, in an amount not less than the Unauthorized Holdbacks and Production Funds, together with the Debtor's actual costs, and (iii) granting such other and further relief that the Court deems appropriate.

**COUNT XII (Against Power, PCT, and William Jegen)**
**WILLFUL VIOLATION OF THE AUTOMATIC STAY**

148.    The Debtor realleges and incorporates by reference herein the preceding paragraphs as if fully set forth herein.

149.    Power, PCT, and Jegen were aware of American Eagle's bankruptcy filing on May 8, 2015.

150.    Power, PCT, and Jegen were aware of the automatic stay of 11 U.S.C. § 362(a), and upon the restrictions of the automatic stay, that arose upon American Eagle's bankruptcy filing on May 8, 2015.

151.    Notwithstanding awareness of the automatic stay, Jegen directed Power and PCT to intentionally violate the automatic stay by acting to obtain possession of property of the estate or of property from the estate or to exercise control property of the estate.

152.    Jegen directed Power and PCT to intentionally violate the automatic stay by acting to enforce alleged liens or setoffs against property of the estate, either for themselves or for other Power Affiliates.

153.    Jegen directed Power and PCT to intentionally violate the automatic stay by acting to collect, assess, setoff, or recover claims against American Eagle that arose before the commencement of the case under this title, either for themselves or for other Power Affiliates.

154.    Through continued holdback of amounts owed by Power to American Eagle, and through transfers from Power to PCT and other Power Affiliates, Jegen, Power, and PCT intentionally violated the automatic stay.

155.    Power, PCT, and Jegen's intentional violation of the automatic stay damaged American Eagle, the bankruptcy estate, and creditors, by reducing the estate's assets, causing

increased administrative expenses, and increasing the recovery for the Power Affiliates in contravention of the priorities of the Bankruptcy Code.

**WHEREFORE**, American Eagle Energy Corporation respectfully requests the Court enter a judgment: (i) against Power, PCT, and Jegen for intentional violation of the automatic stay of 11 U.S.C. § 362(a); (ii) entering a money judgment against Power, PCT, and Jegen for the damages caused, in an amount not less than the Unauthorized Holdbacks and Production Funds, together with the Debtor's actual costs, and (iii) granting such other and further relief that the Court deems appropriate.

### COUNT XIII (Against Power and PCT)
### AVOIDANCE OF PREFERENTIAL TRANSFERS

156.    The Debtor realleges and incorporates by reference herein the preceding paragraphs as if fully set forth herein.

157.    On April 20, 2016, in the ninety day period preceding American Eagle's bankruptcy filing, American Eagle transferred $165,975.00 to Power ("**Power Transfer**").

158.    Between February 18, 2015 and May 7, 2015, American Eagle made six transfers to PCT ("**PCT Transfers**") totaling $830,673.43.

159.    The Power Transfer and the PCT Transfers were transfers from American Eagle of an interest of American Eagle's property:

        a.    To or for the benefit of creditors;

        b.    For or on account of an antecedent debt owed by American Eagle before such transfers were made;

        c.    Made while American Eagle was insolvent;

        d.    Made on or within 90 days before the date of the filing of the petition;

25

      e.     That enabled Power and PCT, respectively, to receive more than each would receive if—

          (A) the case were a case under chapter 7 of the Bankruptcy Code;

          (B) the transfer had not been made; and

          (C) Power and PCT, respectively, received payment of such debts to the extent provided by the Bankruptcy Code.

160.    Pursuant to 11 U.S.C. § 547(b), the Power Transfer and the PCT Transfers are avoidable as preferential transfers.

161.    Pursuant to 11 U.S.C. § 550(a), Power is liable for the amount of the Power Transfer, plus interest.

162.    Pursuant to 11 U.S.C. § 550(a), PCT is liable for the amount of the PCT Transfers, plus interest.

**WHEREFORE**, American Eagle Energy Corporation respectfully requests the Court enter a judgment pursuant to 11 U.S.C. §§ 547(a) and 550(a): (i) against Power and PCT for avoidance of the Power Transfer, and avoidance of the PCT Transfers, respectively; (ii) entering a money judgment against Power for the amount of the Power Transfer and entering a money judgment against PCT for the amount of the PCT Transfers, together with the Debtor's actual costs, and interest; and (iii) granting such other and further relief that the Court deems appropriate.

Respectfully submitted this 30th day of September, 2016.

**BAKER & HOSTETLER LLP**

By:  _/s/ Lars Fuller_
Elizabeth A. Green, Fla. Bar No. 0600547
Laurin D. Quiat, Colo. Bar No. 14687
Jimmy D. Parrish, Fla. Bar No. 526401
Lars Fuller, Colo. Bar No. 26051

1801 California Street, Suite 4400
Denver, Colorado 80202
Telephone:  303-861-0600
Facsimile: 303-861-7805

SunTrust Center, Suite 2300
Post Office Box 112
Orlando, Florida 32802-0112
Telephone:  407-649-4000
Facsimile:  407-841-0168

Email: egreen@bakerlaw.com
Email: lquiat@bakerlaw.com
Email: Jparrish@bakerlaw.com
Email:  lfuller@bakerlaw.com

_Attorneys for the Debtors/Plaintiff_