## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF COLORADO

In re:                                          Chapter 11
American Eagle Energy Corporation               Case No. 15-15073-KHT

AMZG, Inc.                                      Case No. 15-15074-KHT
Debtors.                                        (Jointly Administered)

_____

Walter A. Jones, Liquidating Trustee of the
Liquidating Trust of American Eagle Energy         DC No. 1:16-cv-00043-RM
Corporation,                                       Adversary Proc. No. 15-1444 KHT
Plaintiff,
vs.
Power Energy Partners LP, et al.
Defendants.

## <u>THIRD AMENDED COMPLAINT</u>

Plaintiff Walter A. Jones, Liquidating Trustee of the Liquidating Trust of American Eagle Energy Corporation ("**Plaintiff**"), hereby files this Third Amended Complaint against defendants Power Energy Partners LP ("**PEP**"), T&A Energy, Inc. ("**T&A**"), Power Crude Transport, Inc. ("**PCT**"), William Jegen ("**Jegen**"), Robert Trusz, George Archos ("**Archos**"), John Daniel O'Grady ("**O'Grady**"), Power Energy Marketing LLC ("**PEM**"), Power Energy Holdings LLC ("**PEH**"), Power Energy Partners LLC ("**PEP LLC**"), Power Managed Futures Fund LLC ("**PMFF**"), Power Energy Logistics LLC fka WJ Trading LLC ("**PEL**"), PCT Holding Company, LLC ("**PCH**"), WJHC LLC ("**WJHC**"), Maria Trusz, Anthony Marsico ("**Marsico**"), and Andrew Whitcomb ("**Whitcomb**") (collectively, PEP, T&A, PCT, Jegen, Robert Trusz, Archos, O'Grady, PEM, PEH, PEP LLC, PMFF, PEL, PCH, WJHC, Maria Trusz, Marsico, and Whitcomb are hereinafter referred to as "**Defendants**"):

## PARTIES

1.     Plaintiff is the Liquidating Trustee of the Liquidating Trust of American Eagle Energy Corporation ("**American Eagle**"), established under the confirmed chapter 11 plan of American Eagle in bankruptcy case number 15-15073 HRT ("**Bankruptcy Case**") in the U.S. Bankruptcy Court for the District of Colorado ("**Bankruptcy Court**").

2.     PEP is a Delaware limited partnership.

3.     T&A Energy, Inc. is an Illinois limited liability company.

4.     PCT is an Illinois corporation.

5.     William Jegen is an individual who Plaintiff believes to be residing in Texas.

6.     Robert Trusz is an individual who Plaintiff believes to be residing in Illinois.

7.     Archos is an individual who Plaintiff believes to be residing in Illinois.

8.     O'Grady is an individual who Plaintiff believes to be residing in Illinois.

9.     PEM is an Illinois corporation.

10.    PEH is an Illinois corporation.

11.    PEP LLC is a Delaware corporation.

12.    PMFF is a Delaware corporation.

13.    PEL is a Delaware corporation.

14.    PCH is An Illinois corporation.

15.    WJHC is an Alaska corporation.

16.    Maria Trusz is an individual who Plaintiff believes to be residing in Illinois.

17.    Marsico is an individual who Plaintiff believes to be residing in Illinois.

18.    Whitcomb is an individual who Plaintiff believes to be residing in Illinois or Texas.

## JURISDICTION

19.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a).  This action arises in and relates to the Bankruptcy Case.  Plaintiff is the successor in interest to the claims of American Eagle, the chapter 11 debtor in the Bankruptcy Case.

20.     This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) and (E).

21.     Venue is proper before this Court pursuant to 28 U.S.C. § 1409(a).

22.     This action was commenced on November 4, 2015 in the Bankruptcy Court, adversary proceeding number 15-1444 HRT.  Defendants PEP, PCT, T&A, and Jegen moved to withdraw the reference to the U.S. District Court for the District Court of Colorado ("**District Court**").  On April 7, 2016, the District Court ordered the action withdrawn as to all parties in part.  Case No. 1:16-cv-00043-RM, Dkt. No. 17.  The District Court ordered that the Bankruptcy Court retained its authority to supervise and resolve all pretrial matters, with dispositive rulings on non-core matters subject to review by the District Court upon timely objection made by any party.  *Id.*  Upon completion of all pretrial matters, the parties were directed to contact the District Court to resolve any trial and post-trial related matters, including setting a Final Trial Preparation Conference and trial.  *Id.*

## BACKGROUND

23.     On July 1, 2013, in connection with American Eagle's oil exploration and production business, American Eagle entered into with PEP a Lease Crude Oil Purchase Agreement contract, Number AE-07013-0001 ("**Agreement**"). The Agreement is attached hereto and incorporated herein as **Exhibit "A"**.

24.     The term of the Agreement was July 1, 2013 through December 31, 2015.

25.     The Agreement provided that American Eagle would sell all the oil it produced to PEP.  Specifically, Section 5 of the Agreement provided:

> Net Payment is due without deduction, offset, or counterclaim for amounts owed by or to any third party (including without limitation, amounts owed by or to any affiliate of either Party) on or before the 20th day of the month following the delivery month via wire transfer of immediately available US Dollars.

26.     In conjunction with the Agreement, PEP entered into various agreements with third parties whereby it would immediately sell the oil it collected from American Eagle at a profit ("**Subsequent Sale Agreements**").  Through the Subsequent Sale Agreements, PEP was obligated to deliver fixed quantities of oil to third parties for fixed periods into the future.  Failure to deliver the specified quantities of oil would cause PEP to default under the Subsequent Sale Agreements.

27.     From July 2013 through October 2015, under the Agreement, PEP collected all of American Eagle's oil at American Eagle's various wells.

28.     From July 2013 through October 2015, under the Agreement, PEP was obligated to pay American Eagle for all of American Eagle's oil that PEP collected at a price fixed under the Agreement.

29.     From July 2013 through February 2015, PEP paid all amounts owed to American Eagle under the Agreement.

30.    For all of American Eagle's oil that PEP collected from July 2013 through February 2015, PEP paid all amounts due American Eagle for a particular month's oil collection by the twentieth day of the following month.

*PEP Unauthorized Holdbacks & Nonpayment*

31.    Beginning in April 2015, and continuing through October 2015, PEP, at the direction of Jegen and/or Archos, failed to deliver all amounts due American Eagle for the prior month's oil collection.

32.    Commencing with its obligation for American Eagle's March 2015 oil, and continuing through its obligation for American Eagle's October 2015 oil, PEP began withholding amounts due American Eagle.

33.    For the oil PEP collected from March 2015 through October 2015, PEP, at the direction of Jegen and/or Archos, sold the oil to Global Companies LLC, and upon information and belief, received payments in amounts greater than the amounts PEP owed to American Eagle for such oil.

34.    Aware of American Eagle's financial distress, desiring to offset their likely losses for their equity investment in American Eagle, and desiring to increase American Eagle's dependence on PEP, Jegen and/or Archos began directing PEP to withhold amounts owed by PEP to American Eagle in April 2015.

35.    Beginning with payments due for oil collected in March 2015, Jegen and/or Archos directed PEP to withhold amounts owed American Eagle (**"Unauthorized Holdbacks"**), alleging the Unauthorized Holdbacks were being withheld (a) to pay third party vendors asserting claims against American Eagle (**"Vendors"**); (b) to pay charges for alleged excessive hydrogen sulfide (**"H2S"**); or, (c) to pay other charges assessed by PEP.

5

36.     However, for the amounts withheld, PEP did not transfer the Unauthorized Holdbacks to pay either the Vendors, or to pay H2S related expenses. Instead, at the direction of Jegen and/or Archos, PEP utilized the Unauthorized Holdbacks to pay other PEP expenses, or to otherwise transfer and dissipate the Unauthorized Holdbacks to PEP, Jegen, and Archos's insiders or affiliates.

37.     On May 8, 2015 ("**Petition Date**"), American Eagle and its affiliate AMZG, Inc., filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code ("**Bankruptcy Code**").

38.     In addition to the pre-petition Unauthorized Holdbacks, PEP continued to improperly withhold amounts owed to American Eagle after the Petition Date.

39.     On August 19, 2015, PEP delivered approximately $1.725 million of improperly withheld Unauthorized Holdbacks.  However, as of September 20, 2015, PEP continued to owe American Eagle **$1,410,045.54** for pre-petition and post-petition Unauthorized Holdbacks.  The Unauthorized Holdbacks remain unpaid to date.

40.     Of the Unauthorized Holdbacks, PEP has wrongfully withheld **$1,039,954.21** from payments to American Eagle for fees related to alleged excessive H2S content in oil collected by PEP ("**Unauthorized H2S Holdbacks**").

41.     Of the Unauthorized Holdbacks, PEP has wrongfully withheld **$112,735.20** from payments to Plaintiff for alleged pre-petition water hauling charges PEP alleges American Eagle owed to PCT ("**Unauthorized Pre-petition Holdbacks**").

42.     Of the Unauthorized Holdbacks, PEP has wrongfully withheld **$177,101.02** from payments to American Eagle for duplicate water hauling charges previously paid to PCT by Plaintiff ("**Unauthorized Duplicate Holdbacks**").

43.     Of the Unauthorized Holdbacks, PEP has wrongfully withheld **$80,255.11** from payments to American Eagle for improper legal and accounting fees ("**Unauthorized Professional Fee Holdbacks**").

44.     American Eagle notified PEP that PEP was in breach of the Agreement as a result of its failure to deliver the Unauthorized Holdbacks, including the Unauthorized H2S Holdbacks, the Unauthorized Pre-petition Holdbacks, the Unauthorized Duplicate Holdbacks, and the Unauthorized Professional Fee Holdbacks.

45.     Additionally, PEP failed to deliver any payment for American Eagle's September 2015 and October 2015 oil.  After taking American Eagle's oil in September 2015, PEP failed to deliver to American Eagle the approximately $2,784,880.27 ("**September Production Funds**") it owed to American Eagle for such oil.  After taking American Eagle's oil in October 2015, PEP failed to deliver to American Eagle the approximately $2,497,653.55 ("**October Production Funds**") it owed to American Eagle for such oil.  Together, the September Production Funds and the October Production Funds total $5,282,533.82 ("**Total Production Funds**").

46.     In October 2015, PEP agreed to allow Global Companies, LLC, the purchaser from PEP of the October 2015 oil PEP took from American Eagle, to direct a partial payment to American Eagle in the net amount of $513,471.86.  The partial payment reduced PEP's obligation to American Eagle for the Total Production Funds by that same amount, leaving a balance owed by PEP to American Eagle for the Total Production Funds of **$4,769,061.96**.

47.     The Unauthorized Holdbacks of $1,410,045.054 together with the Total Production Funds of $4,769,061.96 total **$6,179,107.50 ("Total Principal")**, not including accumulating interest.

48.     American Eagle notified PEP that PEP was in breach of the Agreement as a result of its failure to deliver the Total Principal. American Eagle contacted PEP repeatedly and requested that PEP immediately deliver the Total Principal, including the Total Production Funds and the Unauthorized Holdbacks.

49.     PEP has refused to deliver the Total Principal to American Eagle, or to Plaintiff, American Eagle's successor.

50.     PEP does not dispute that it collected the oil from American Eagle for the September Production and the October Production, or that it sold the oil it collected to Global Companies LLC at amounts greater than the amounts owed to American Eagle.  Instead of delivering the Total Production Funds, or the Total Principal to American Eagle, PEP transferred those amounts to third parties, insiders, and affiliates.

51.     Despite receiving payments in September 2015 in excess of $700,000 from PEP for obligations allegedly owed by American Eagle, PCT continues to assert that it holds a secured mechanic's lien claim in the amount of **$820,485.54** against American Eagle ("**PCT Claim**").  PCT has not provided substantiation for the amount, or basis, of its PCT Claim.

*PEP Management, Insiders & Affiliates*

52.     PEP, T&A, PCT, Jegen, and Archos are all affiliated with one another.  Jegen and Archos, either individually or through other entities, are controlling principals, managers, officers, directors, shareholders, or partners of PEP, T&A, and PCT.

53.     Robert Trusz, Archos, Jegen, and O'Grady are each controlling principals, managers, officers, directors, shareholders, investors, or partners of PEP.

54.     PEP's partners are T&A as General Partner and PEP LLC as limited partner. Archos and Robert Trusz signed the PEP partnership agreement on behalf of T&A.  Jegen and O'Grady signed the PEP partnership agreement on behalf of PEP LLC.

55.     On information and belief, Robert Trusz and Archos are also the controlling partners of T&A, which stands for "Trusz & Archos."

56.     On information and belief, O'Grady and Jegen are also the controlling members of PEP LLC.

57.     On information and belief, Jegen and/or Archos, as organizers, promoters, or investment advisors, obtained capital from individuals in multiple entities affiliated with PEP and the Managers, including T&A, PCT, PEM, PEP LLC, PCH, PEH, PEL, PMFF, and WJHC (the "**PEP Affiliates**").

58.     On information and belief, between 2012 and 2017, PEP made transfers to the PEP Affiliates without providing reasonably equivalent value.

59.     On information and belief, Jegen and Archos, either directly or indirectly, control the PEP Affiliates.  With Archos and Robert Trusz filling management roles, Jegen bills himself as the "President and CEO" of the PEP Affiliates, controlling the affiliated entities.

60.     On information and belief, Jegen and/or Archos received salary, wages, commissions, fees, utilization of entity-owned assets, other benefits, and/or payments of or reimbursements for personal expenses, from the PEP Affiliates.

61.     On information and belief, through the PEP Affiliates, Jegen and/or Archos constructed and orchestrated an enterprise of affiliated entities utilizing one another for cash flow, creditor avoidance, fraudulent transfers, alter ego, and distribution of funds to insiders and affiliates.

62.     In January 2013, one of the PEP Affiliates, PEH, acquired a percentage of American Eagle's stock (the "**Stock**") for approximately $10 million.  In August 2013, PEH acquired an additional percentage of the Stock for approximately $4 million.  Between these two transactions, PEH acquired 12.9 percent of the Stock.  On information and belief, PEP funded both transactions.

63.     On information and belief, Jegen and Archos control, manage, or direct PEH.

64.     Through the Agreement, the Stock, and PCT's revenue for services related to the Agreement, Jegen, Archos, and the PEP Affiliates were significantly invested in American Eagle, and dependent on American Eagle's revenue and financial success for their own economic prosperity.

65.     On information and belief, Jegen, Robert Trusz, Archos, and O'Grady are the controlling managers of PEP and the PEP Affiliates ("**Managers**").

66.     On information and belief, Maria Trusz, Marsico, and Whitcomb, along with T&A, PCT, PEM, PEP LLC, PCH, PEH, PEL, PMFF, and WJHC, are affiliates and insiders of PEP (the "**Insiders and Affiliates**").

67.     The Managers, Insiders and Affiliates are insiders and affiliates of PEP, and hold controlling interests, either individually or remotely, in PEP's two partners, i.e., T&A, and PEP LLC, as well as, on information and belief, interests in other PEP Affiliates.

68.     On information and belief, PEP, PCT, and T&A have been liquidated and wound-up, with all assets distributed or transferred away from the entities.

69.     Jegen and Archos, with the assistance of the other Managers, have operated the PEP Affiliates as alter egos, misusing corporate entities to facilitate fraudulent transfers, hide assets, deceive creditors, and commit fraud.

70.     On information and belief, there are in excess of twenty-eight PEP Affiliates controlled by Jegen, Archos, and the other Managers.   Jegen's personal weblog (http://williamjegen.wordpress.com [last accessed April 3, 2017]) reveals the existence of even more possible PEP Affiliates, which Jegen claims to have managed, created, and/or co-created, including Power Managed Futures Fund, WJ Proprietary Trading LLC, and Monterey Asset Management.

71.     [Paragraph 71 omitted]

72.     [Paragraph 72 omitted]

73.     [Paragraph 73 omitted]

74.     [Paragraph 74 omitted]

*PEP and Jegen Reaction to American Eagle's Financial Distress*

75.     From August 2013 onward, Jegen communicated frequently with American Eagle regarding the Stock, American Eagle's operations, and strategic issues, providing recommendations for actions by American Eagle, raising concerns about American Eagle's value, critiquing management, and requesting inside financial information not disseminated to the public.  At various times prior to October 2014, Jegen communicated with American Eagle management about his concerns over American Eagle's stock price.

76.     Commencing in approximately October 2014, aggressive production and intentionally reduced prices by Saudi Arabian oil sellers caused the price per barrel of oil in the United States to begin to drop precipitously, greatly reducing revenues from the sale of oil and gas.  The drop in revenue caused significant distress to American oil and gas companies, including American Eagle, whose operational expense and debt service obligations depended on a healthy value for the sale of their oil.

77.     American Eagle's financial distress concerned PEP, Jegen, and/or Archos, who were worried that American Eagle's inability to produce oil, or sell its assets, would severely reduce the value of the Stock held by PEH, jeopardize PEP's obligations under the Subsequent Sale Agreements, and severely reduce PEP's revenues and cash flow, from which PEP, Jegen, Archos, and the PEP Affiliates, benefitted. Additionally, Jegen and/or Archos were significantly concerned that they had promoted the investment value of American Eagle Stock to individuals, and his professional performance and reputation as an investment advisor was imperiled by American Eagle's financial distress.

78.     Through late 2014 and early 2015, Jegen contacted American Eagle frequently, inquiring about American Eagle's negotiations with its creditors, the status of its operations, and requesting financial data and reports.   Jegen, for PEP and Archos, attempted to negotiate a "Crude Oil Marketing Agreement" by which he could extend American Eagle's commitment to deliver oil to PEP.   By early 2015, Jegen was aware that American Eagle would likely default on its debt financing obligations, and that the senior secured lender was threatening foreclosure of its security interests in American Eagle. At the same time, Jegen was aware that the $14 million equity investment by PEH was significantly imperiled, and would be unrecoverable in the event of a foreclosure, asset sale, or bankruptcy of American Eagle.

79.     Commencing April 2015, Jegen and/or Archos directed PEP to withhold certain amounts from payments from PEP to American Eagle.   Jegen and/or Archos directed PEP to withhold the amounts to attempt to offset PEP's and PEH's potential losses in the event of a foreclosure, asset sale, or potential bankruptcy by American Eagle.

80.     While commencing his strategy to reduce potential losses by PEP and other PEP Affiliates, Jegen misrepresented to American Eagle that he was its ally in defending against its

financial distress, and with its negotiations with its senior secured creditor. Beginning in March 2015, Jegen indicated to American Eagle that he was attempting to put together a potential "white knight" funding source ("**Potential Financing**") to help American Eagle through its financial distress. During this period, Jegen solicited extensive assistance from American Eagle in obtaining financial information and developing valuation and acquisition strategy. Relying on PEP's historic relationship with American Eagle, including frequent communications and an established confidential relationship, Jegen implied that he would assist American Eagle in avoiding foreclosure by its senior secured creditor, through an asset purchase he was orchestrating. Through these communications, Jegen obtained frequent access to confidential financial data, and was able to constantly monitor American Eagle's financial state.

81.    Jegen knowingly misrepresented his intention to assist American Eagle with the Potential Financing. Instead, Jegen utilized his unique access to American Eagle management and financial data to obtain continued access to American Eagle oil, withholding amounts owed to American Eagle, and while planning to sell American Eagle's oil to PEP's third-party purchaser without paying American Eagle for it.

82.    Upon American Eagle's bankruptcy filing in May 2015, Jegen continued to communicate frequently with American Eagle management about his desire to acquire American Eagle's assets. As the bankruptcy proceeded, however, Jegen failed to organize a competitive bid for American Eagle's assets. As American Eagle's investment banker organized and facilitated an asset sale transaction under 11 U.S.C. § 363, Jegen actively monitored the developments and the role that PEP might play with a potential purchaser of American Eagle's oil. At, or shortly after an auction held on October 21, 2015, the asset purchaser advised Jegen

and PEP that it would not assume the Agreement, or otherwise negotiate a deal with PEP for the sale of the future production of oil from the assets it was purchasing from American Eagle.

83.     On or about October 21, 2015, Jegen, Archos, and PEP were aware that American Eagle would reject the Agreement, and PEP would not receive any further oil from American Eagle, or the asset purchaser, after the closing of the asset sale.  Jegen and Archos were aware that PEP would be unable to fulfill its future obligations to PEP's third-party oil purchaser, Global Companies, LLC.  Jegen and Archos were aware that PEH would not receive any recovery for its $14 million equity investment in American Eagle.  Jegen and/or Archos directed PEP to withhold all of the Total Production Funds that PEP owed American Eagle for American Eagle's September 2015 and October 2015 oil production.

84.     On or about October 22, 2015, Jegen and/or Archos directed PEP to pay as many expenses as possible, or to otherwise dissipate all amounts that PEP had in its possession that it had received from selling American Eagle's September 2015 and October 2015 production, including through fraudulent transfers to Insiders and Affiliates.  PEP accordingly transferred funds to Managers, Insiders and Affiliates, among others.  On information and belief, PEP also made transfers to an unidentified insider and/or affiliate on an "Investment Debenture" in the principal amount of $450,000.

85.     By November 5, 2015, under Jegen's and/or Archos' direction, PEP had transferred and dissipated all of the funds it had received from the sale of American Eagle's September 2015 and October 2015 production as well as the funds from the Unauthorized Holdbacks.

## COUNT I (Against Power Energy Partners, LP)

## ACCOUNTING

86.     Plaintiff realleges and incorporates by reference herein the preceding paragraphs as if fully set forth herein.

87.     PEP has an obligation under the Agreement to pay Plaintiff without offset, deduction, or counterclaim for amounts owed by or to any third party (including without limitation, amounts owed by or to any affiliate of either party) on or before the 20th day of the month following the delivery month via wire transfer of immediately available US Dollars.

88.     PEP has failed to comply with the Agreement in that it has failed to deliver the Total Production Funds and it has wrongfully withheld the Unauthorized Holdbacks.

89.     PEP has received, and failed to deliver to Plaintiff, approximately **$6,179,107.50** in funds belonging to Plaintiff, and has failed to account to Plaintiff for such funds.

90.     PEP has indicated that it is no longer in possession of the majority of, if not all of, the **$6,179,107.50** owed to Plaintiff and that it is currently "bankrupt."

91.     Plaintiff is entitled to an accounting of the approximately **$6,179,107.50** of Plaintiff's funds it has received, withheld, continues to hold, or has transferred.

**WHEREFORE**, Plaintiff respectfully requests the Court enter a judgment ordering PEP to immediately provide an accounting of all amounts owed to Plaintiff, and granting such other and further relief that the Court deems appropriate.

## COUNT II (Against Power Energy Partners, LP)

## BREACH OF CONTRACT

92.     Plaintiff realleges and incorporates by reference herein the preceding paragraphs as if fully set forth herein.

93.    PEP and Plaintiff entered into the Agreement whereby Plaintiff is required to sell its oil to PEP monthly and PEP is required to remit payment on the 20th day of every month to Plaintiff.

94.    The Agreement is binding and enforceable.

95.    PEP does not dispute that Plaintiff has performed its obligations under the Agreement.

96.    PEP has failed to deliver the Total Production Funds earned by Plaintiff in exchange for the oil that PEP received as required under Section 5 of the Agreement.

97.    PEP has also wrongfully withheld the Unauthorized Holdbacks from amounts rightfully owed to Plaintiff.

98.    Consequently, on or about April 20, 2015, PEP breached the Agreement.

99.    Plaintiff has notified PEP that it is in breach of the Agreement as a result of its failure to remit the various payments to Plaintiff.

**WHEREFORE**, Plaintiff respectfully requests the Court enter a judgment: (i) finding that PEP has breached the Agreement; (ii) against PEP in favor of Plaintiff in the amount of **$6,179,107.50**, plus interest and costs; and (iii) granting such other and further relief that the Court deems appropriate.

## COUNT III (Against T&A Energy, Inc., Robert Trusz, and George Archos)

### FRAUDULENT TRANSFER

### (C.R.S. §§ 38-8-105 and 38-8-106)

100.    Plaintiff re-alleges and incorporates by reference herein the preceding paragraphs as if fully set forth herein.

16

101.     Since prior to the Petition Date, PEP has owed funds to Plaintiff, including amounts related to the Unauthorized Holdbacks.

102.     Between 2012 and 2016, PEP made transfers to or for the benefit of, or incurred obligations to or for the benefit of, T&A, Archos, and Robert Trusz in the amount of more than $35 million:

    (a)    With actual intent to hinder, delay, or defraud any creditor of PEP; or,

    (b)    Without receiving a reasonably equivalent value in exchange for the transfers or obligations, and PEP:

        (I)    Was engaged or was about to engage in a business or a transaction for which the remaining assets of PEP were unreasonably small in relation to the business or transaction; or,

        (II)    Intended to incur, or believed or reasonably should have believed that it would incur, debts beyond PEP's ability to pay as they became due.

103.     T&A is an "insider" of PEP as that term is defined under C.R.S. § 38-8-102.

104.     Archos and Trusz are both "insiders" of both PEP and T&A as that term is defined under C.R.S. § 38-8-102.

**WHEREFORE**, Plaintiff respectfully requests the Court enter a judgment: (i) avoiding the actual fraudulent transfers made or obligations incurred to or for the benefit of T&A, Archos, and Robert Trusz in violation of C.R.S. §§ 38-8-105 and 38-8- 106; (ii) entering a money judgment against T&A, Archos, and Robert Trusz for the lesser of one and one one-half of the value of the assets transferred or obligations incurred or one and one half of the amount

necessary to satisfy Plaintiff's claim, together with Plaintiff's actual costs, including reasonable attorneys' fees; and (iii) granting such other and further relief that the Court deems appropriate.

## COUNT IV (Against Power Crude Transport, Inc.)

## FRAUDULENT TRANSFER

## (C.R.S. §§ 38-8-105 and 38-8-106)

105.    Plaintiff realleges and incorporates by reference herein the preceding paragraphs as if fully set forth herein.

106.    Since prior to the Petition Date, PEP has owed funds to Plaintiff, including amounts related to the Unauthorized Holdbacks.  Such amounts remain owed and unpaid.

107.    Between 2012 and 2016, PEP made transfers to or for the benefit of, or incurred obligations to or for the benefit of, PCT in the amount of more than $702,826.78 to PCT:

(a)    With actual intent to hinder, delay, or defraud any creditor of PEP; or,

(b)    Without receiving a reasonably equivalent value in exchange for the transfers or obligations, and PEP:

(I)    Was engaged or was about to engage in a business or a transaction for which the remaining assets of PEP were unreasonably small in relation to the business or transaction; or,

(II)    Intended to incur, or believed or reasonably should have believed that it would incur, debts beyond PEP's ability to pay as they became due. PEP did not receive reasonably equivalent value in return for the transfers and/or obligations incurred to PCT.

108.    PCT is an "insider" of PEP as that term is defined under C.R.S. §38-8-102.

**WHEREFORE**, Plaintiff respectfully requests the Court enter a judgment: (i) avoiding the actual fraudulent transfers made to or obligations incurred for the benefit of PCT in violation of C.R.S. §§ 38-8-105 and 38-8-106; (ii) entering a money judgment against PCT for the lesser of one and one one-half of the value of the assets transferred or obligations incurred or one and one half of the amount necessary to satisfy Plaintiff's claim, together with Plaintiff's actual costs, including reasonable attorneys' fees; and (iii) granting such other and further relief that the Court deems appropriate.

## COUNT V (Against John Daniel O'Grady)

## FRAUDULENT TRANSFER

## (C.R.S. §§ 38-8-105 and 38-8-106)

109.     Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

110.     Since prior to the Petition Date, PEP has owed funds to Plaintiff, including amounts related to the Unauthorized Holdbacks.  Such amounts remain owed and unpaid.

111.     Between 2012 and 2016, PEP made transfers to O'Grady totaling at least $605,427.58.

112.     PEP made the transfers to or for the benefit of, or incurred obligations to or for the benefit of, O'Grady:

      (a)     With actual intent to hinder, delay, or defraud any creditor of PEP; or,

      (b)     Without receiving a reasonably equivalent value in exchange for the transfers or obligations, and PEP:

(I)    Was engaged or was about to engage in a business or a transaction for which the remaining assets of PEP were unreasonably small in relation to the business or transaction; or,

(II)    Intended to incur, or believed or reasonably should have believed that it would incur, debts beyond PEP's ability to pay as they became due.

113.    O'Grady is an "insider" of PEP as that term is defined under C.R.S. §38-8-102.

**WHEREFORE**, Plaintiff respectfully requests the Court enter a judgment: (i) avoiding the fraudulent transfers made or obligations incurred to or for the benefit of O'Grady in violation of C.R.S. §§ 38-8-105 and 38-8-106; (ii) entering a money judgment against O'Grady for the lesser of the value of the assets transferred or obligations incurred or the amount necessary to satisfy Plaintiff 's claim, together with Plaintiff's actual costs, including reasonable attorneys' fees; and (iii) granting such other and further relief that the Court deems appropriate.

## COUNT VI (Against Power Energy Marketing LLC)

## FRAUDULENT TRANSFER

## (C.R.S. §§ 38-8-105 and 38-8-106)

114.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

115.    Since prior to the Petition Date, PEP has owed funds to Plaintiff, including amounts related to the Unauthorized Holdbacks. Such amounts remain owed and unpaid.

116.    Between 2012 and 2016, PEP made transfers to or for the benefit of, or incurred obligations to or for the benefit of, PEM totaling at least $1,085,486.91:

(a)    With actual intent to hinder, delay, or defraud any creditor of PEP; or,

20

    (b)    Without receiving a reasonably equivalent value in exchange for the transfers or obligations, and PEP:

        (I)    Was engaged or was about to engage in a business or a transaction for which the remaining assets of PEP were unreasonably small in relation to the business or transaction; or,

        (II)    Intended to incur, or believed or reasonably should have believed that it would incur, debts beyond PEP's ability to pay as they became due.

117.    PEM is an "insider" of PEP as that term is defined under C.R.S. §38-8-102.

**WHEREFORE**, Plaintiff respectfully requests the Court enter a judgment: (i) avoiding the fraudulent transfers made or obligations incurred to or for the benefit of PEM in violation of C.R.S. §§ 38-8-105 and 38-8-106; (ii) entering a money judgment against PEM for the lesser of the value of the assets transferred or obligations incurred or the amount necessary to satisfy Plaintiff's claim, together with Plaintiff's actual costs, including reasonable attorneys' fees; and (iii) granting such other and further relief that the Court deems appropriate.

## COUNT VII (Against Power Energy Holdings LLC)

### FRAUDULENT TRANSFER

### (C.R.S. §§ 38-8-105 and 38-8-106)

118.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

119.    Since prior to the Petition Date, PEP has owed funds to Plaintiff, including amounts related to the Unauthorized Holdbacks.  Such amounts remain owed and unpaid.

120.    Between 2012 and 2016, PEP made transfers to or for the benefit of, or incurred obligations to or for the benefit of, PEH, of at least $250,000:

    (a)    With actual intent to hinder, delay, or defraud any creditor of PEP; or,

    (b)    Without receiving a reasonably equivalent value in exchange for the transfers or obligations, and PEP:

        (I)    Was engaged or was about to engage in a business or a transaction for which the remaining assets of PEP were unreasonably small in relation to the business or transaction; or,

        (II)    Intended to incur, or believed or reasonably should have believed that it would incur, debts beyond PEP's ability to pay as they became due.

121.    PEH is an "insider" of PEP as that term is defined under C.R.S. §38-8-102.

**WHEREFORE**, Plaintiff respectfully requests the Court enter a judgment: (i) avoiding the fraudulent transfers made or obligations incurred to or for the benefit of PEH in violation of C.R.S. §§ 38-8-105 and 38-8-106; (ii) entering a money judgment against PEH for the lesser of the value of the assets transferred or obligations incurred or the amount necessary to satisfy Plaintiff's claim, together with Plaintiff's actual costs, including reasonable attorneys' fees; and (iii) granting such other and further relief that the Court deems appropriate.

## COUNT VIII (Against Power Energy Partners LLC)

## FRAUDULENT TRANSFER

## (C.R.S. §§ 38-8-105 and 38-8-106)

122.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

123.     Since prior to the Petition Date, PEP has owed funds to Plaintiff, including amounts related to the Unauthorized Holdbacks.  Such amounts remain owed and unpaid.

124.     Between 2012 and 2016, PEP made transfers to or for the benefit of, or incurred obligations to or for the benefit of, PEP LLC, its limited partner, in an amount of at least $2.7 million:

    (a)     With actual intent to hinder, delay, or defraud any creditor of PEP; or,

    (b)     Without receiving a reasonably equivalent value in exchange for the transfers or obligations, and PEP:

        (I)     Was engaged or was about to engage in a business or a transaction for which the remaining assets of PEP were unreasonably small in relation to the business or transaction; or,

        (II)    Intended to incur, or believed or reasonably should have believed that it would incur, debts beyond PEP's ability to pay as they became due.

125.     PEP LLC is an "insider" of PEP as that term is defined under C.R.S. §38-8-102.

**WHEREFORE**, Plaintiff respectfully requests the Court enter a judgment: (i) avoiding the fraudulent transfers made or obligations incurred to or for the benefit of PEP LLC in violation of C.R.S. §§ 38-8-105 and 38-8-106; (ii) entering a money judgment against PEP LLC for the lesser of the value of the assets transferred or obligations incurred or the amount necessary to satisfy Plaintiff's claim, together with Plaintiff's actual costs, including reasonable attorneys' fees; and (iii) granting such other and further relief that the Court deems appropriate.

### COUNT IX (Against Power Managed Futures Fund LLC)

### FRAUDULENT TRANSFER

### (C.R.S. §§ 38-8-105 and 38-8-106)

126.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

127.    Since prior to the Petition Date, PEP has owed funds to Plaintiff, including amounts related to the Unauthorized Holdbacks.  Such amounts remain owed and unpaid.

128.    Between 2012 and 2016, PEP made transfers to or for the benefit of, or incurred obligations to or for the benefit of, PMFF of at least $7,500:

      (a)    With actual intent to hinder, delay, or defraud any creditor of PEP; or,

      (b)    Without receiving a reasonably equivalent value in exchange for the transfers or obligations, and PEP:

            (I)    Was engaged or was about to engage in a business or a transaction for which the remaining assets of PEP were unreasonably small in relation to the business or transaction; or,

            (II)    Intended to incur, or believed or reasonably should have believed that it would incur, debts beyond PEP's ability to pay as they became due.

129.    PMFF is an "insider" of PEP as that term is defined under C.R.S. §38-8-102.

**WHEREFORE**, Plaintiff respectfully requests the Court enter a judgment: (i) avoiding the fraudulent transfers made or obligations incurred to or for the benefit of Power Managed Futures Fund LLC in violation of C.R.S. §§ 38-8-105 and 38-8-106; (ii) entering a money judgment against PMFF for the lesser of the value of the assets transferred or obligations incurred or the amount necessary to satisfy Plaintiff's claim, together with Plaintiff's actual

costs, including reasonable attorneys' fees; and (iii) granting such other and further relief that the Court deems appropriate.

## COUNT X (Against Power Energy Logistics (fka WJ Trading LLC))

## FRAUDULENT TRANSFER

## (C.R.S. §§ 38-8-105 and 38-8-106)

130.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

131.    Since prior to the Petition Date, PEP has owed funds to Plaintiff, including amounts related to the Unauthorized Holdbacks.  Such amounts remain owed and unpaid.

132.    Between 2012 and 2016, PEP made transfers to or for the benefit of, or incurred obligations to or for the benefit of, PEL of at least $300,000:

   (a)    With actual intent to hinder, delay, or defraud any creditor of PEP; or,

   (b)    Without receiving a reasonably equivalent value in exchange for the transfers or obligations, and PEP:

      (I)    Was engaged or was about to engage in a business or a transaction for which the remaining assets of PEP were unreasonably small in relation to the business or transaction; or,

      (II)    Intended to incur, or believed or reasonably should have believed that it would incur, debts beyond PEP's ability to pay as they became due.

133.    PEL is an "insider" of PEP as that term is defined under C.R.S. §38-8-102.

   **WHEREFORE**, Plaintiff respectfully requests the Court enter a judgment: (i) avoiding the fraudulent transfers made or obligations incurred to or for the benefit of PEL in violation of

C.R.S. §§ 38-8-105 and 38-8-106; (ii) entering a money judgment against PEL for the lesser of the value of the assets transferred or obligations incurred or the amount necessary to satisfy Plaintiff's claim, together with Plaintiff's actual costs, including reasonable attorneys' fees; and (iii) granting such other and further relief that the Court deems appropriate.

## COUNT XI (Against PCT Holding Company LLC)

## FRAUDULENT TRANSFER

## (C.R.S. §§ 38-8-105 and 38-8-106)

134.    Plaintiff  realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

135.    Since prior to the Petition Date, PEP has owed funds to Plaintiff, including amounts related to the Unauthorized Holdbacks.  Such amounts remain owed and unpaid.

136.    Between 2012 and 2016, PEP made transfers to or for the benefit of, or incurred obligations to or for the benefit of, PCH:

(a)     With actual intent to hinder, delay, or defraud any creditor of PEP; or,

(b)     Without receiving a reasonably equivalent value in exchange for the transfers or obligations, and PEP:

(I)     Was engaged or was about to engage in a business or a transaction for which the remaining assets of PEP were unreasonably small in relation to the business or transaction; or,

(II)    Intended to incur, or believed or reasonably should have believed that it would incur, debts beyond PEP's ability to pay as they became due.

137.    PCH is an "insider" of PEP as that term is defined under C.R.S. §38-8-102.

**WHEREFORE**, Plaintiff respectfully requests the Court enter a judgment: (i) avoiding the fraudulent transfers made or obligations incurred to or for the benefit of PCH in violation of C.R.S. §§ 38-8-105 and 38-8-106; (ii) entering a money judgment against PCH for the lesser of the value of the assets transferred or obligations incurred or the amount necessary to satisfy Plaintiff's claim, together with Plaintiff's actual costs, including reasonable attorneys' fees; and (iii) granting such other and further relief that the Court deems appropriate.

**COUNT XII (Against WJHC LLC)**

**FRAUDULENT TRANSFER**

**(C.R.S. §§ 38-8-105 and 38-8-106)**

138.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

139.    Since prior to the Petition Date, PEP has owed funds to Plaintiff, including amounts related to the Unauthorized Holdbacks.  Such amounts remain owed and unpaid.

140.    Between 2012 and 2016, PEP made transfers to or for the benefit of, or incurred obligations to or for the benefit of, WJHC:

(a)    With actual intent to hinder, delay, or defraud any creditor of PEP; or,

(b)    Without receiving a reasonably equivalent value in exchange for the transfers or obligations, and PEP:

(I)    Was engaged or was about to engage in a business or a transaction for which the remaining assets of PEP were unreasonably small in relation to the business or transaction; or,

(II)     Intended to incur, or believed or reasonably should have believed that it would incur, debts beyond PEP's ability to pay as they became due.

141.    WJHC is an "insider" of PEP as that term is defined under C.R.S. §38-8-102.

**WHEREFORE**, Plaintiff respectfully requests the Court enter a judgment: (i) avoiding the fraudulent transfers made or obligations incurred to or for the benefit of WJHC in violation of C.R.S. §§ 38-8-105 and 38-8-106; (ii) entering a money judgment against WJHC for the lesser of the value of the assets transferred or obligations incurred or the amount necessary to satisfy Plaintiff's claim, together with Plaintiff's actual costs, including reasonable attorneys' fees; and (iii) granting such other and further relief that the Court deems appropriate.

## COUNT XIII (Against Maria Trusz)

## FRAUDULENT TRANSFER

## (C.R.S. §§ 38-8-105 and 38-8-106)

142.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

143.    Since prior to the Petition Date, PEP has owed funds to Plaintiff, including amounts related to the Unauthorized Holdbacks.  Such amounts remain owed and unpaid.

144.    Between 2012 and 2016, PEP made transfers to or for the benefit of, or incurred obligations to or for the benefit of, Maria Trusz of at least $270,000:

(a)     With actual intent to hinder, delay, or defraud any creditor of PEP; or,

(b)     Without receiving a reasonably equivalent value in exchange for the transfers or obligations, and PEP:

28

     (I)     Was engaged or was about to engage in a business or a transaction for which the remaining assets of PEP were unreasonably small in relation to the business or transaction; or,

     (II)     Intended to incur, or believed or reasonably should have believed that it would incur, debts beyond PEP's ability to pay as they became due.

145.    Maria Trusz is an "insider" of PEP as that term is defined under C.R.S. §38-8-102.

**WHEREFORE**, Plaintiff respectfully requests the Court enter a judgment: (i) avoiding the fraudulent transfers made or obligations incurred to or for the benefit of Maria Trusz in violation of C.R.S. §§ 38-8-105 and 38-8-106; (ii) entering a money judgment against Maria Trusz for the lesser of the value of the assets transferred or obligations incurred or the amount necessary to satisfy Plaintiff's claim, together with Plaintiff's actual costs, including reasonable attorneys' fees; and (iii) granting such other and further relief that the Court deems appropriate.

## COUNT XIV (Against Anthony Marsico)

## FRAUDULENT TRANSFER

## (C.R.S. §§ 38-8-105 and 38-8-106)

146.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

147.    Since prior to the Petition Date, PEP has owed funds to Plaintiff, including amounts related to the Unauthorized Holdbacks. Such amounts remain owed and unpaid.

148.    Between 2012 and 2016, PEP made transfers to or for the benefit of, or incurred obligations to or for the benefit of, Anthony Marsico of at least $2.1 million:

(a)     With actual intent to hinder, delay, or defraud any creditor of PEP; or,

(b)     Without receiving a reasonably equivalent value in exchange for the transfers or obligations, and PEP:

(I)     Was engaged or was about to engage in a business or a transaction for which the remaining assets of PEP were unreasonably small in relation to the business or transaction; or,

(II)    Intended to incur, or believed or reasonably should have believed that it would incur, debts beyond PEP's ability to pay as they became due.

149.    Anthony Marsico is an "insider" of PEP as that term is defined under C.R.S. §38-8-102.

**WHEREFORE**, Plaintiff respectfully requests the Court enter a judgment: (i) avoiding the fraudulent transfers made or obligations incurred to or for the benefit of Anthony Marsico in violation of C.R.S. §§ 38-8-105 and 38-8-106; (ii) entering a money judgment against Anthony Marsico for the lesser of the value of the assets transferred or obligations incurred or the amount necessary to satisfy Plaintiff's claim, together with Plaintiff's actual costs, including reasonable attorneys' fees; and (iii) granting such other and further relief that the Court deems appropriate.

<u>**COUNT XV (Against Andrew Whitcomb)**</u>

<u>**FRAUDULENT TRANSFER**</u>

<u>**(C.R.S. §§ 38-8-105 and 38-8-106)**</u>

150.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

151.     Since prior to the Petition Date, PEP has owed funds to Plaintiff, including amounts related to the Unauthorized Holdbacks.  Such amounts remain owed and unpaid.

152.     Between 2012 and 2016, PEP made transfers to or for the benefit of, or incurred obligations to or for the benefit of, Andrew Whitcomb of at least $1,500,000:

      (a)     With actual intent to hinder, delay, or defraud any creditor of PEP; or,

      (b)     Without receiving a reasonably equivalent value in exchange for the transfers or obligations, and PEP:

            (I)     Was engaged or was about to engage in a business or a transaction for which the remaining assets of PEP were unreasonably small in relation to the business or transaction; or,

            (II)    Intended to incur, or believed or reasonably should have believed that it would incur, debts beyond PEP's ability to pay as they became due.

153.     Andrew Whitcomb is an "insider" of PEP as that term is defined under C.R.S. §38-8-102.

**WHEREFORE**, Plaintiff respectfully requests the Court enter a judgment: (i) avoiding the fraudulent transfers made or obligations incurred to or for the benefit of Andrew Whitcomb in violation of C.R.S. §§ 38-8-105 and 38-8-106; (ii) entering a money judgment against Andrew Whitcomb for the lesser of the value of the assets transferred or obligations incurred or the amount necessary to satisfy Plaintiff's claim, together with Plaintiff's actual costs, including reasonable attorneys' fees; and (iii) granting such other and further relief that the Court deems appropriate.

## COUNT XVI

### (Against T&A Energy, Inc.; Power Crude Transport, Inc.; William Jegen; and George Archos)

### TORTIOUS INTERFERENCE WITH CONTRACT

154.    Plaintiff realleges and incorporates by reference herein the preceding paragraphs as if fully set forth herein.

155.    Defendants T&A, PCT, Jegen, and Archos were each aware of the existence of the Agreement.

156.    Defendants T&A, PCT, Jegen, and Archos were each aware of PEP's obligations under the Agreement to preserve and not transfer the September Production Funds and the October Production Funds to parties other than Plaintiff.

157.    Defendants T&A, PCT, Jegen, and Archos each intended to induce PEP to breach its obligations under the Agreement.

158.    Defendants T&A, PCT, Jegen, and Archos each intended to induce PEP to transfer some or all of the September Production Funds and the October Production Funds to parties other than Plaintiff.

159.    Defendants T&A, PCT, Jegen, and Archos each intended to induce PEP to transfer some or all of the September Production Funds and the October Production Funds to parties other than Plaintiff in knowing and intentional violation of PEP's obligations under the Agreement.

160.    Defendants T&A, PCT, Jegen, and Archos each took action to induce PEP to breach its obligations under the Agreement by demanding or directing PEP to transfer some or all of the September Production Funds and the October Production Funds to parties other than Plaintiff.

32

161.    Defendants T&A, PCT, Jegen, and Archos each took action to induce PEP to breach its obligations under the Agreement by accepting some or all of the September Production Funds and the October Production Funds from PEP.

162.    Defendants T&A, PCT, Jegen, and Archos tortiously interfered with the Agreement.

163.    Defendants T&A, PCT, Jegen, and Archos's tortious interference with the Agreement proximately caused damages to Plaintiff  by rendering PEP unable to meet its obligations to Plaintiff under the Agreement.

**WHEREFORE**, Plaintiff respectfully requests the Court enter judgment against T&A, PCT, Jegen, and Archos for tortious interference with the Agreement and entering a money judgment against T&A, PCT, Jegen, and Archos, severally, for damages in an amount to be proven at trial, together with Plaintiff's actual costs, including reasonable attorneys' fees, and granting such other and further relief that the Court deems appropriate.

## COUNT XVII (Against William Jegen)

## FRAUDULENT TRANSFER

## (C.R.S. §§ 38-8-105 and 38-8-106)

164.    Plaintiff realleges and incorporates by reference herein the preceding paragraphs as if fully set forth herein.

165.    Since prior to the Petition Date, PEP has owed funds to Plaintiff, including amounts related to the Unauthorized Holdbacks.  Such amounts remain owed and unpaid.

166.    Between 2012 and 2016, PEP made transfers to or for the benefit of, or incurred obligations to or for the benefit of, Jegen of at least $2 million:

(a)     With actual intent to hinder, delay, or defraud any creditor of PEP; or,

(b)      Without receiving a reasonably equivalent value in exchange for the transfers or obligations, and PEP:

(I)      Was engaged or was about to engage in a business or a transaction for which the remaining assets of PEP were unreasonably small in relation to the business or transaction; or,

(II)     Intended to incur, or believed or reasonably should have believed that it would incur, debts beyond PEP's ability to pay as they became due.

167.    Jegen is an "insider" of PEP as that term is defined under C.R.S. §38-8-102.

**WHEREFORE**, Plaintiff respectfully requests the Court enter a judgment: (i) avoiding the fraudulent transfers made or obligations incurred to or for the benefit of Jegen in violation of C.R.S. §§ 38-8-105 and 38-8-106; (ii) entering a money judgment against Jegen for the lesser of the value of the assets transferred or obligations incurred or the amount necessary to satisfy Plaintiff's claim, together with Plaintiff's actual costs, including reasonable attorneys' fees; and (iii) granting such other and further relief that the Court deems appropriate.

## COUNT XVIII (Against William Jegen and George Archos)

## FALSE PRETENSES, FALSE REPRESENTATION,

## OR ACTUAL FRAUD

168.    Plaintiff realleges and incorporates by reference herein the preceding paragraphs as if fully set forth herein.

169.    PEP transferred the Unauthorized Holdbacks ("**Holdback Transfers**") to third parties, including Managers, Insiders and Affiliates ("**Managers, Insiders and Affiliates**").

170.    After receiving the Total Production Funds, PEP transferred the Total Production Funds ("**Production Transfers**") to Managers, Insiders and Affiliates.

171.    Jegen and/or Archos directed PEP to not transfer the Total Production Funds and Unauthorized Holdbacks to American Eagle.

172.    Jegen and/or Archos directed PEP to transfer the Holdback Transfers and the Production Transfers to Managers, Insiders and Affiliates.

173.    Jegen and/or Archos are affiliated with, and/or are insiders of, the Managers, Insiders and Affiliates.

174.    The Managers, Insiders and Affiliates are affiliated with, and/or are insiders of, Jegen and/or Archos.

175.    Jegen and/or Archos are controlling officers, directors, managers, or principals of the PEP Affiliates, or hold equity, or other financial interest, either directly or through third parties, in the PEP Affiliates.

176.    Jegen and/or Archos personally benefitted, including financially, from the Production Transfers and Holdback Transfers to Managers, Insiders and Affiliates.

177.    But for the Production Transfers and the Holdback Transfers, PEP could have paid the Total Production Funds and the Unauthorized Holdbacks to Plaintiff.

178.    For their own benefit, and for the benefit of the Managers, Insiders and Affiliates, Jegen and/or Archos directed PEP to transfer, or caused to be transferred, the Production Transfers and Holdback Transfers.

179.    For their own benefit, Jegen and/or Archos directed PEP, or caused PEP, to perpetrate a fraud on Plaintiff, creating the impression that Plaintiff would be paid the Total

Production Funds and the Unauthorized Holdbacks, while instead dissipating and transferring the money that could have paid Plaintiff.

180.     Jegen, for himself, and for the benefit of Archos, PEP, the Managers, Insiders and Affiliates, created such an impression in part by deliberately creating in Plaintiff a false perception of his trustworthiness, background, expertise and skills. Jegen made the same representations to American Eagle of his background, skills, and expertise as he presented on his personal weblog (http://williamjegen.wordpress.com [last accessed December 9, 2016]) throughout 2013. In making these false representations and concealing these facts, Jegen intended that Plaintiff would rely on his false representations and concealment to its detriment, and Plaintiff so relied.

181.     Jegen and/or Archos did not intend for PEP to transfer the Unauthorized Holdbacks or Total Production Funds to Plaintiff when they directed, or caused PEP to collect Plaintiff's oil between March 2015 and October 2015 ("**Mar-Oct Production**").

182.     Through past performance and the development of a highly communicative, trusting, and mutually dependent relationship between Plaintiff and PEP, enhanced by the Stock and the Potential Financing, Jegen for himself, and for the benefit of Archos, PEP, the Managers, Insiders and Affiliates, utilized false pretenses, false representations, and actual fraud to deceive and defraud Plaintiff into allowing PEP to continue to collect the Mar-Oct Production from Plaintiff without paying Plaintiff for such oil in full.

183.     Jegen and/or Archos intended to deceive and defraud Plaintiff by directing or causing PEP to collect the Mar-Oct Production, and directing or causing PEP to not pay Plaintiff the Total Production Funds or Unauthorized Holdbacks.

36

184.     Jegen and/or Archos intended to deceive and defraud Plaintiff by directing or causing PEP to transfer the Holdback Transfers and Production Transfers to Managers, Insiders and Affiliates.

185.     Jegen and/or Archos intended that Plaintiff would rely on PEP's prior performance, and its highly communicative, trusting, and mutually dependent relationship with PEP, enhanced by the Stock and the Potential Financing, and Jegen's assurances of future performance, in allowing PEP to continue to collect Plaintiff's Mar-Oct Production.

186.     Plaintiff reasonably and justifiably relied on PEP's past performance and its highly communicative, trusting, and mutually dependent relationship with PEP, enhanced by the Stock and the Potential Financing, and Jegen's assurances of future performance in allowing PEP to continue to collect the Mar-Oct Production.

187.     Jegen and/or Archos intended to utilize the Unauthorized Holdbacks and Total Production Funds for their personal benefit, and for the benefit of the Managers, Insiders and Affiliates, at the expense of Plaintiff, the bankruptcy estate, and Plaintiff's creditors.

188.     Plaintiff, the bankruptcy estate, and American Eagle's creditors were actually damaged by Jegen's and Archos's false pretenses, false representation, or actual fraud, in the amount of the Total Principal, plus interest, attorney's fees, and costs.

**WHEREFORE**, Plaintiff respectfully requests the Court enter a judgment: (i) against Jegen and Archos, jointly and severally, for false pretenses, false representation, or actual fraud against Plaintiff; (ii) entering a money judgment against Jegen and Archos, jointly and severally, for the damages caused, in an amount not less than the Total Principal, together with Plaintiff's actual costs, interest, and (iii) granting such other and further relief that the Court deems appropriate.

## COUNT XIX (Against Power Energy Partners, L.P.,

## Power Crude Transport, Inc., George Archos, and William Jegen)

## WILLFUL VIOLATION OF THE AUTOMATIC STAY

189.    Plaintiff realleges and incorporates by reference herein the preceding paragraphs as if fully set forth herein.

190.    PEP, PCT, Jegen, and Archos were aware of Plaintiff's bankruptcy filing on May 8, 2015.

191.    PEP, PCT, Jegen, and Archos were aware of the automatic stay of 11 U.S.C. § 362(a), and upon the restrictions of the automatic stay, that arose upon Plaintiff's bankruptcy filing on May 8, 2015.

192.    Notwithstanding awareness of the automatic stay, Jegen and/or Archos directed PEP and PCT to intentionally violate the automatic stay by acting to obtain possession of property of the estate or of property from the estate or to exercise control property of the estate.

193.    Jegen and/or Archos directed PEP and PCT to intentionally violate the automatic stay by acting to enforce alleged liens or setoffs against property of the estate, either for themselves or for other PEP Affiliates.

194.    Jegen and/or Archos directed PEP and PCT to intentionally violate the automatic stay by acting to collect, assess, setoff, or recover claims against Plaintiff that arose before the commencement of the case under this title, either for themselves or for other PEP Affiliates.

195.    Through continued holdback of amounts owed by PEP to Plaintiff, and through transfers from PEP to PCT and other PEP Affiliates, Jegen, Archos, PEP, and PCT intentionally violated the automatic stay.

196.    PEP, PCT, Jegen, and Archos's intentional violation of the automatic stay damaged Plaintiff, the bankruptcy estate, and creditors, by reducing the estate's assets, causing

increased administrative expenses, and increasing the recovery for the PEP Affiliates in contravention of the priorities of the Bankruptcy Code.

**WHEREFORE**, Plaintiff respectfully requests the Court enter a judgment: (i) against PEP, PCT, Jegen, and Archos for intentional violation of the automatic stay of 11 U.S.C. § 362(a); (ii) entering a money judgment against PEP, PCT, Jegen, and Archos for the damages caused, in an amount not less than the Unauthorized Holdbacks and Total Production Funds, together with Plaintiff's actual costs, and (iii) granting such other and further relief that the Court deems appropriate.

## COUNT XX

### (Against Power Energy Partners, L.P., and Power Crude Transport, Inc.)

### AVOIDANCE OF PREFERENTIAL TRANSFERS

197.    Plaintiff realleges and incorporates by reference herein the preceding paragraphs as if fully set forth herein.

198.    On April 20, 2016, in the ninety day period preceding Plaintiff's bankruptcy filing, American Eagle transferred $165,975.00 to PEP ("**PEP Transfer**").

199.    Between February 18, 2015 and May 7, 2015, American Eagle made six transfers to PCT ("**PCT Transfers**") totaling $830,673.43.

200.    The PEP Transfer and the PCT Transfers were transfers from American Eagle of an interest of American Eagle's property:

> (a)    To or for the benefit of creditors;

> (b)    For or on account of an antecedent debt owed by American Eagle before such transfers were made;

> (c)    Made while American Eagle was insolvent;

39

(d)     Made on or within 90 days before the date of the filing of the petition;

(e)     That enabled PEP and PCT, respectively, to receive more than each would receive if—

     (I)     the case were a case under chapter 7 of the Bankruptcy Code;

     (II)     the transfer had not been made; and

     (III)     PEP and PCT, respectively, received payment of such debts to the extent provided by the Bankruptcy Code.

201.    Pursuant to 11 U.S.C. § 547(b), the PEP Transfer and the PCT Transfers are avoidable as preferential transfers.

202.    Pursuant to 11 U.S.C. § 550(a), PEP is liable for the amount of the PEP Transfer, plus interest.

203.    Pursuant to 11 U.S.C. § 550(a), PCT is liable for the amount of the PCT Transfers, plus interest.

**WHEREFORE**, Plaintiff respectfully requests the Court enter a judgment pursuant to 11 U.S.C. §§ 547(a) and 550(a): (i) against PEP and PCT for avoidance of the PEP Transfer, and avoidance of the PCT Transfers, respectively; (ii) entering a money judgment against PEP for the amount of the PEP Transfer and entering a money judgment against PCT for the amount of the PCT Transfers, together with the Plaintiff's actual costs, and interest; and (iii) granting such other and further relief that the Court deems appropriate.

Dated As of April 14, 2017.

Respectfully submitted,

s/Christian C. Onsager
Christian C. Onsager, #6889
Andrew D. Johnson, #36879
Gabrielle G. Palmer, #48948
Onsager | Fletcher | Johnson LLC
1801 Broadway, Suite 900
Denver, Colorado 80202
Phone: (303) 512-1123
Fax No.: (303) 512-1129
consager@OFJlaw.com
ajohnson@OFJlaw.com
gpalmer@OFJlaw.com

## CERTIFICATE OF SERVICE

I certify that on August 18, 2017, I served a copy of the Foregoing Third Amended Complaint by CM/ECF and by United States mail, postage prepaid, to the following:

Bruce Dopke                     Lars H. Fuller                    Aaron A Garber
55 W. Monroe St., Ste. 1200     1801 California St. Ste. 4400     999 18th St. Ste. 1230 S.
Chicago, IL 60603-5127          Denver, CO 80202-2662            Denver, CO 80202-2499


Melissa J. Lettiere             Laurin D. Quiat                   John F. Young
55 W. Monroe, Ste. 1200         1801 California St Ste. 4400      1700 Lincoln St. Ste. 4550
Chicago, IL 60603-5127          Denver, CO 80202-2662            Denver, CO 80203-4509



*s/ Barbara A. Moss*